UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | § | |
| | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | Civil Action G-06-776 |
| | § | |
| CHARLES K. SCRUGGS, | § | |
| | § | |
| *Defendant*. | § | |

## ORDER

The parties came before the court on February 18, 2009, for a hearing to address the civil penalty to be imposed for defendant Charles K. Scruggs's 2006 violation of the Clean Water Act. After considering the briefs filed by the parties, relevant filings, testimony at the hearing, and applicable law the court ORDERS defendant to pay a civil penalty of $65,000.00. In support of its ruling, the court makes the following findings of fact and conclusions of law pursuant to Federal Rule of Civil Procedure 52(a).[1]

### I. FINDINGS OF FACT

1.  Wetlands and adjacent wetlands perform many ecological functions; they provide a habitat for vegetation and wildlife, sequester pollution to prevent it from entering the watershed, and house flood waters. Any alteration in wetlands or adjacent wetlands can result in a reduction of water quality.

---

[1] To the extent that any finding of fact is more properly characterized as a conclusion of law, or vice versa, the court adopts it as such.

2. The facts and circumstances surrounding defendant's 2006 violation of the Clean Water Act ("CWA") are set forth in the magistrate judge's memorandum and recommendation and this court's order adopting the same. Dkts. 37, 40. In summary, the violation at issue involved the placement of approximately .02 acre of unpermitted fill in three areas of adjacent wetlands on defendant's property bordering Offatts Bayou, which is visible from Interstate Highway 45.

3. At the time of the violation, metal stakes were in place on the property to delineate the wetlands as a result of a prior violation and related discussions between defendant and the United States Army Corps of Engineers ("Corps"). Defendant understood that the metal stakes represented the wetland boundaries.

4. Defendant testified that he instructed a contractor to create several sand "berms," or small hills, on upland areas of the property and to avoid placement of sand in the delineated areas. Instead, the contractor smoothed the sand, pushing some of it into the adjacent wetland areas.

5. Conflicting statements in the record prevent the court from determining the date or approximate date on which the violation occurred. Testimony indicated that the contractor's work was performed at or near the time of Hurricane Rita, but a supplemental filing indicated that it was later. *See* Dkt. 46. The earliest confirmed date that the violation existed is the date it was detected by the Corps: January 25, 2006. Dkt. 41.

6. After discovering the violation, the Corps issued a cease and desist order to defendant on February 1, 2006. Dkt. 41.

7. Defendant responded to the Corps by fax on March 2, 2006, indicating: (a) that he was not doing anything presently of which he was aware; (b) that the effects may have been the result of Hurricane Rita; and (c) that defendant's contractor improperly spread the fill into the

2

adjacent wetlands and had been asked to remove it in advance of defendant's receipt of the cease and desist order. Dkt. 41. There are inherent conflicts in defendant's initial response. However, defendant's testimony at the hearing reaffirmed that he recognized the existence of the violation at the time the fill initially was pushed into the wetlands by the contractor.

8. Defendant again contacted the Corps on March 20, 2006, having not received a response to his first fax. In the second fax, defendant abandons the arguments that he is unclear as to the nature of the violation and that the violation may have, in part, been caused by Hurricane Rita. Defendant reiterates his contractor's willingness to restore the wetlands, but indicates that the government was unwilling to assist the contractor by providing information. Dkt. 41.

9. Defendant has not accepted responsibility for his actions. Although denying familiarity with the regulations, defendant admitted having navigated the permitting process previously. Additionally, defendant continues to dispute that the area at issue is in fact wetlands.

10. The government refused to provide some assistance requested by defendant and defendant's contractor allegedly needed to remedy the violation, including the provision of a map. The extent of the government's refusal to assist in the restoration is not clear, but it is undisputed that metal rods were in place to delineate the boundary between the wetlands and the uplands.

11. The restoration was not complete at the time that either the first or second fax was sent to the Corps. Defendant's contractor did not remedy the violation immediately or within a short time frame. However, defendant made no attempt to contact another resource to perform the restoration.

12. The parties do not dispute that the violation at issue has been remedied by defendant. Dkt. 37. But, the exact date that the property was restored cannot be confirmed. Therefore, the court substitutes the last known date that the violation existed, March 20, 2006, the date that the last fax was sent, as the restoration date. Dkt. 41.

13. While the administrative matrices utilized by the Corps to determine administrative penalties are not determinative, the factors considered in the matrix are persuasive and primarily encompassed within the statutorily defined considerations relevant to this court's inquiry.

14. The violation at issue did not harm or threaten human health or wildlife.

15. Defendant's property is visible from Interstate Highway 45, which is elevated and overlooks the property. Testimony from the government witness indicates that average citizens do report visible environmental law violations to the Corps. However, the court does not conclude that the violation was clearly visible from the highway because the witness who initially observed the violation from the highway admitted that he could not ascertain whether the violation had been remedied from that same vantage point. In fact, the primary indicator that an infraction had occurred was not the existing violation, but piles of sand and equipment that were visible one day and absent soon after.

16. There are no allegations that defendant obtained a financial benefit from the violation, nor has evidence been introduced to support such a finding.

17. Defendant has a history of violations of environmental laws and regulations. Defendant entered into a settlement agreement with the Corps in May 2003 to redress a series of violations occurring in 2002 and 2003. Dkt. 41, 42.

18. The civil penalty of $15,000.00 assessed as part of the settlement agreement did not deter future violations on the property, nor did it cause defendant to oversee vigilantly the

   activities of his contractor or ensure prompt remedy of the contractor's mistake. The defendant directed and had control over the contractor and is responsible for the actions of his contractor.

19. Defendant's home and Galveston office sustained significant damage in the wake of Hurricane Ike. While the damage at the home is likely to be repaired, it is not anticipated that insurance will fully reimburse defendant for the costs of restoration. Additionally, defendant's Galveston dental practice has been closed since the hurricane. Defendant does, however, work out of a leased office in Texas City.

## II. CONCLUSIONS OF LAW

1. Section 1311 of Title 33 of the United States Code is the "keystone of the Act's attack on point sources of pollution." *Avoyelles Sportsmen's League v. Alexander*, 473 F. Supp. 525, 530 (W.D. La. 1979).

2. Specifically, Section 1311 provides: "Except as in compliance with this section and sections 1312, 1316, 1317, 1328, 1342, and 1344 of this title, the discharge of any pollutant by any person shall be unlawful." 33 U.S.C. § 1311. And, Section 1344 specifically authorizes the Corps to issue permits for the discharge of dredged or fill material into navigable waters. 33 U.S.C. § 1344.

3. Section 1319 of Title 33 of the United States Code provides that: "Any person who violates section 1311 . . . of this title . . . shall be subject to a civil penalty not to exceed $25,000 per day for each violation." 33 U.S.C. § 1319(d).

4. Section 1319 "requires that the Court impose some fine upon [the] Defendant." *United States v. Van Leuzen*, 816 F. Supp. 1171, 1179 (S.D. Tex. 1993). And, "[t]his language

strongly suggests that where a violation is defined in terms of a time period longer than a day, the maximum penalty to assessable for the violation should be defined in terms of the number of days in that period." *United States v. Aluminum Co. of Am.*, 824 F. Supp. 640, 650 (E.D. Tex. 1993).

5. The Fifth Circuit endorsed the "top-down" methodology for calculating the appropriate civil penalty. *Sierra Club v. Cedar Point Oil Co.*, 73 F.3d 546, 573 (5th Cir. 1996). Applying the top-down approach, the court begins by calculating maximum penalty and then reduces the figure by weighing the statutorily defined criteria. *Id.*

6. Utilizing the dates of January 25, 2006, through March 20, 2006, as the dates that the violation existed, the maximum statutory penalty is $1,375,000.00. This figure is obtained by multiplying the fifty-five days between January 25, 2006, and March 20, 2006, by the maximum penalty of $25,000.00 per day. Assuming *arguendo* that a nominal penalty would be approximately two cents for every dollar of the maximum statutory penalty, the nominal penalty would total $27,500.00.

7. "In determining the amount of a civil penalty the court shall consider the seriousness of the violation or violations, the economic benefit (if any) resulting from the violation, any history of such violations, any good-faith efforts to comply wit the applicable requirements, the economic impact of the penalty on the violator, and such other matters as justice may require." 33 U.S.C. § 1319.

8. "The Supreme Court has described the process of weighing the statutory factors in calculating civil penalties under the CWA as 'highly discretionary.'" *Sierra Club*, 73 F.3d at 576 (quoting *Tull v. United States*, 481 U.S. 412, 427, 107 S. Ct. 1831 (1987)). Even a

penalty assessed solely on the basis of one factor has been upheld, as long as the other factors were in fact considered. *Id.*

9. The seriousness of the violation is assessed by evaluating several factors, "including, but not limited to: (1) the number of violations; (2) the duration of noncompliance; (3) the significance of the violation (degree of exceedance and relative importance of the provision violated); and (4) the actual or potential harm to human health and the environment." *Hawaii's Thousand Friends v. City & County of Honolulu*, 821 F. Supp. 1368, 1383 (D. Hawaii 1993); *see also United States v. Gulf Park Water Co.*, F. Supp. 2d 854, 857 (S.D. Miss. 1998).

10. In the instant case, the number of violations would be three, if each separate area where the fill was placed constitutes a separate offense, which this court does not find. Instead, the court finds that the current violation constitutes a single offense involving placement of approximately .02 acre of fill in three areas of the same property. The duration of noncompliance is, at the very least, fifty-five days, prior to and during which time, all avenues of redressing the situation were not pursued by defendant. Although the violation was not significant in terms of the scope of the area and amount of land at issue, Sections 1311 and 1344, the provisions that were violated form the cornerstone of the CWA regulatory framework. Notwithstanding that observation, the court determines that a significant decrease is warranted because the violation did not threaten or adversely impact the health of humans, wildlife, or the environment.

11. Although the government also argues that the violation is serious because of the highly visible location of the property and flagrant nature of the infraction, the court is not persuaded that average citizen passers by and onlookers would readily observe and recognize

that a violation existed on the property in this particular case. Indeed, there is no evidence that any citizens complained to the Corps about this violation.

12. The economic benefit calculation "is intended, as its base, to identify the benefit realized by a violator from delayed expenditures to comply with the CWA." *United States v. Allegheny Ludlum Corp.*, 366 F.3d 164, 178 (3d Cir. 2004).

13. Because neither party alleges that the defendant benefitted financially from the improper filling of the adjacent wetlands, and the government concedes that there is no evidence to support such a finding, the court does not consider this factor in determining the amount of the civil penalty. The court does note that the fact that the defendant did not benefit financially from the violation suggests that a severe penalty is not appropriate in the instant case.

14. "In determining the 'history of such violations.' courts consider the duration of defendant['s] current violations, whether defendant[ has] committed similar violations in the past, and the duration and nature of all such violations, including whether the violations are perpetual or sporadic." *Gulf Park Water Co.*, 14 F. Supp. 2d at 864.

15. Without deciding whether it is proper to consider individual violations outside the statute of limitations period in assessing the civil penalty,[2] the court observes generally that defendant has a lengthy history of similar noncompliance dating back to 1993. Further, the 2002 and 2003 violations were within the statute of limitations period when the instant case was filed in 2006. And, in fact, the 2002 and 2003 claims alone involved a series of separate

---

[2] The court in *United States v. ConAgra, Inc.*, No. CV 96-0134-S-LMB, 1997 WL 33545777, at *24–25 (D. Idaho Dec. 31, 1997), granted a motion in limine preventing the introduction of evidence at trial of violations outside the statute of limitations for the purpose of increasing the civil penalty without the court first examining the evidence on a limited basis and determining that the defendant had, in fact, been found guilty of violating the statute.

        violations occurring within a few months of one another. Thus, defendant's activities are not sporadic in nature, thereby suggesting that a significant reduction in the penalty amount is not warranted.

16. Courts have considered several aspects of the claim in determining whether defendant demonstrated a "good faith effort" to comply with the applicable CWA requirements. In particular, courts have considered both the duration of the violation and defendant's reasonable belief that a permit was not necessary. *See Sierra Club*, 73 F.3d at 573; *Catskill Mountains Chapter of Trout Unlimited, Inc. v. City of New York*, 451 F.3d 77, 87 (2d Cir. 2006).

17. Here, defendant provided duplicitous responses in the faxes sent to the Corps and, to date, accepts little, if any, personal responsibility for the violation. Defendant admitted to understanding the purpose of the stakes delineating the wetland boundaries—despite disagreeing with the determination—and recognizing that, at the time the contractor initially performed the work, the violation existed. Therefore, it does not follow that he had a reasonable belief that a violation did not exist or that a permit was unnecessary. Nonetheless, defendant ultimately did restore the property. And, evidence that the government was even partially unwilling to provide defendant with the information and assistance requested to remedy the violation mitigates against the imposition of a severe penalty.

18. The defendant bears the burden of demonstrating "that the impact of a penalty would be ruinous or otherwise disabling." *Gulf Park Water Co.*, 14 F. Supp. 2d at 868. "Where a violator cannot show that a penalty will have a ruinous effect, the economic impact factor under [33 U.S.C. § 1319] will not reduce the penalty." *Id.*

19. Because the defendant has suffered a significant decrease in business due to the closure of his Galveston dental office and significant residential and professional property damage as a result of Hurricane Ike, the court concludes that a severe penalty is not appropriate. However, the court does not accept defendant's argument that the costs of litigating the proceeding should be considered in assessing the financial impact of the penalty on the defendant.

20. "The legislative history of the [Clean Water] Act reveals that Congress wanted the district court to consider the need for retribution and deterrence, in addition to restitution, when it impose[s] civil penalties." *Tull*, 481 U.S. at 422 (citing 123 CONG. REC. 39191 (1977)).

21. "To achieve the goal of deterrence, a penalty must be high enough so that the discharger cannot 'write it off' as an acceptable environmental trade-off for doing business." *Gulf Park Water Co.*, 14 F. Supp. 2d at 869 (quoting *Hawaii's Thousand Friends*, 821 F. Supp. at 1394). The analogy is not lost for individuals, particularly in light of the defendant's disregard for the regulatory requirements of the CWA.

22. Although a civil penalty of $15,000.00 was assessed per the terms of the settlement agreement resolving the 2002 and 2003 violations, the penalty did not sufficiently deter defendant, who admitted telling his contractor that "frankly, [he didn't] care" about the wetland delineations, but the government did. Therefore, the penalty to be assessed should be increased from that assessed for the 2003 and 2003 violations.

## III. Conclusion

It is, therefore, ORDERED that defendant pay a civil penalty of $65,000.00. This amount shall be due and payable immediately. The court retains jurisdiction to implement and enforce this order and to take all actions or enter all necessary orders to ensure that the civil penalty is paid, in strict conformity herewith.

Signed at Houston, Texas on February 26, 2009.

_____
Gray H. Miller
United States District Judge

TO ENSURE PROPER NOTICE, EACH PARTY RECEIVING THIS ORDER SHALL
FORWARD IT TO EVERY OTHER PARTY AND AFFECTED NONPARTY